UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

RONALD VYSKOCIL,

Plaintiff,

v. Case No. 26-cv-1405

GRACE KNUTSON,

Defendant.

---

**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND GRANTING PLAINTIFF'S REQUEST FOR EXPEDITED BRIEFING (DKT. NO. 4)**

---

## I. Allegations in the Complaint (Dkt. No. 1)

On August 17, 2026, the plaintiff filed a class action complaint. Dkt. No. 1. The complaint explained that Wis. Stat. §301.48(2) requires the Wisconsin Department of Corrections (DOC or Department) to maintain lifetime tracking of people with certain convictions or histories of civil commitments, and that Wis. Stat. §301.48(3)(a) requires the DOC to implement "a continuous global positioning tracking system to electronically monitor the whereabouts" of covered people, using "equipment . . . with as large a coverage area as possible" to "automatically provide instantaneous information regarding the whereabouts of a person who is being monitored." Id. at ¶¶13, 14. It asserts that this lifetime tracking is required even after the covered person has fully completed his or her criminal sentence and no longer is under any kind of criminal justice supervision. Id. at ¶1 (citing Wis. Stat. §301.48). The complaint alleges that the

device used to accomplish this continuous global tracking is a battery-powered ankle monitor that needs regular charging; the wearer cannot remove the device without violating Wis. Stat. §946.465. Id. at ¶15.

The complaint alleges that the DOC has a policy of refusing to remove the GPS ankle monitor of people subject to lifetime monitoring when those people "travel out of state temporarily, regardless of the destination, the duration of the trip, the individual's compliance history, or any hardship the device imposes on the traveler." Id. at ¶22. The complaint concedes that this policy is long-standing. Id. at ¶27. It alleges that the DOC "thus conducts continuous, 24-hour-a-day surveillance and tracking of persons outside Wisconsin's borders—persons over whom the Department concedes it has no supervisory authority and whose movement it has no power to restrict." Id. at ¶33. The complaint emphasizes that there is a statutory exception for people otherwise subject to monitoring who move out of state, id. at ¶20 (citing Wis. Stat. §301.48(7m)), and asserts that "the Department routinely removes GPS devices temporarily so that monitored persons may undergo medical procedures—such as MRIs—and reattaches the devices after the procedure is complete," id. at ¶19. The complaint emphasizes that the plaintiffs are challenging only the DOC's refusal "to remove the GPS device from a person's ankle when that person travels out of state temporarily—for example, for a family vacation—no matter the destination, the duration of the trip, or the circumstances of the individual." Id. at ¶2.

The complaint asserts that the DOC has no statutory authority to restrict the movement of covered, monitored persons if they no longer are on any kind of criminal justice supervision. Id. at ¶21. Citing the State's representations to the Seventh Circuit Court of Appeals in another case challenging GPS monitoring, the complaint asserts that covered persons who are no longer under supervision "are free to travel anywhere—throughout Wisconsin, to other states, and internationally—just like any other citizen." Id. at ¶21 (citing Antrim v. Hoy, Appeal No. 25-1460 at Dkt. No. 12 (Defendant/Appellee's Brief filed July 17, 2025, at 30).

The complaint seeks relief on behalf of a class of all persons "who are or will be subject to lifetime GPS monitoring pursuant to Wis. Stat. § 301.48 and who are not on probation, parole, extended supervision, or any other form of criminal-justice supervision, and who intend to travel outside of Wisconsin." Id. at ¶58. The complaint alleges that "[t]he Department's continued, forced attachment of a GPS device to class members' bodies during temporary out-of-state travel—which class members may not remove on pain of felony prosecution—constitutes an ongoing seizure of the person and an ongoing physical trespass upon the person." Id. at ¶63. It alleges that that seizure is "unreasonable," because when class members are traveling outside of Wisconsin,

> the Department has no supervisory authority over class members and no power to restrict their movement; the Department routinely removes devices temporarily for medical procedures; the Department itself removed devices for out-of-state travel—including Plaintiff's own device in 2023—before reversing course without

> explanation; and removal and reinstallation impose at most a trivial administrative burden.

Id. at ¶64.

The complaint also alleges that "[b]ecause the Department requires class members to keep their devices charged during out-of-state travel, the policy also subjects class members to continuous, warrantless, suspicionless search beyond Wisconsin's borders—round-the-clock location surveillance of persons the Department concedes are free to travel like any other citizen." Id. at ¶65. It asserts that when people subject to monitoring travel outside Wisconsin, "the governmental interests in tracking the individual are significantly diminished," because Wisconsin does not have the authority or jurisdiction to investigate or prosecute crimes that occur in other jurisdictions; for this reason, the complaint alleges that monitoring covered individuals when they are outside of Wisconsin "is independently an unreasonable search under the Fourth Amendment." Id. The complaint alleges that the policy of refusing to remove the device "violates the Fourth Amendment rights of Plaintiff and the class both on its face and as applied." Id. at ¶69.

The complaint also details information about the named plaintiff:

> 37. [The plaintiff] has worn a Department GPS device continuously since he became subject to lifetime monitoring in 2017. Throughout that time, he has maintained strict compliance with all program requirements. He has sustained zero equipment violations, has maintained consistent communication with Department personnel, and has completed all required programming.
>
> 38. [The plaintiff's] children have arranged, at their own expense, a one-week trip to Hawaii, from November 29 to December 5, 2026, for [the plaintiff] and his wife, Kerrie, to celebrate the couple's 30th wedding anniversary.

39. On June 8, 2026, [the plaintiff] emailed Steven Landreman, a Corrections Program Specialist with the Department, explaining the planned anniversary trip and asking: "Can I get the GPS removed right before we leave and then put back on right when we get back?"

40. Mr. Landreman replied the same day: "I would think so," and forwarded the request to a colleague to address.

41. On June 17, 2026, Mr. Landreman forwarded the request to Monica Lukach, another Corrections Program Specialist. In the same email, Mr. Landreman asked Ms. Lukach to assist [the plaintiff] "with scheduling his GPS Removal for a medical procedure"—that is, at the very moment the Department was refusing to remove [the plaintiff's] device for travel, it was simultaneously scheduling the removal of that same device for a medical appointment.

42. Later on June 17, 2026, Ms. Lukach emailed [the plaintiff], directing him to call the Monitoring Center "for all service requests . . . including for medical appointments," and stating: "As far as Hawaii, that is part of the United States- the GPS will remain on."

43. [The plaintiff] replied the same day, asking Ms. Lukach to confirm his understanding that he was not required to keep the device charged while outside Wisconsin, and asking her to identify the legal authority requiring the device to remain attached during out-of-state travel within the United States.

44. On June 19, 2026, Ms. Lukach responded by citing Wis. Stat. § 301.48(7m)—the provision mandating termination of tracking for persons who move out of state—and referring [the plaintiff] to another specialist for "further discussion . . . about travel and keeping your unit charged as you have in the past when you have left the state for travel."

45. [The plaintiff] replied that he had read § 301.48(7m), that it does not address temporary travel, that he was not seeking to move, and asked whether any statute addresses keeping the GPS device attached during temporary out-of-state travel. On June 22, 2026, Ms. Lukach responded that she and her colleague "will no longer be responding on this issue about GPS and travel out of Wisconsin."

46. Meanwhile, on June 19, 2026, [the plaintiff] emailed Defendant Knutson requesting temporary removal or modification of his GPS monitoring for the trip. The letter set out the purpose of the travel (his 30th wedding anniversary), the destination (Hawaii), the

approximate dates (approximately one week in late November 2026), and the mode of travel (commercial flight from Chicago or Milwaukee), and offered to provide exact dates, flight numbers, and hotel information. The letter detailed his spotless compliance record. It explained that the device "poses a substantial hardship for this specific trip" because of "the long-distance transpacific flight, the strict airport security screenings, and the frequent water-based activities or high-humidity conditions inherent to a Hawaii itinerary," which make "maintaining and charging the device" a severe logistical challenge. And he offered alternatives: "I am fully prepared to adhere to alternative check-in schedules, check in daily by phone, or report to local Hawaii law enforcement if required."

47. On June 25, 2026, Defendant Knutson responded. Her entire substantive reply consisted of one sentence: "The law does not allow for GPS to be removed for travel."

48. [The plaintiff] replied the same day, asking Ms. Knutson to identify the statute imposing that restriction. On June 26, 2026, Ms. Knutson responded:

> The statute that mandates GPS is 301.48. Specifically, 301.48 (3)(a) requires 'continuous global positioning tracking system to electronically monitor the whereabouts.' There is no language in the statute that allows for removal of GPS for temporary travel out of state. You are mandated to wear GPS, unless you change your residence outside of Wisconsin.

49. [The plaintiff] then asked whether the device could at least be removed for international travel. Ms. Knutson responded that the statute "does not allow GPS to be removed for any travel," and added: "People wearing GPS have traveled nationally and internationally without issues."

50. [The plaintiff] pointed out that when he previously traveled to the Dominican Republic, the Department removed his device. Ms. Knutson replied: "GPS is no longer removed for any travel."

51. On June 26, 2026, [the plaintiff] asked Ms. Knutson when the Department's practice of removing devices for travel had changed and who had made that decision. Ms. Knutson never responded.

52. On June 30, 2026, Mr. Landreman telephoned [the plaintiff]. During the call, Mr. Landreman confirmed that [the plaintiff] is not on probation or parole and is free to travel wherever he wishes. Mr.

Landreman suggested that if [the plaintiff] wanted the GPS device off, one option was to move out of Wisconsin permanently.

53. On July 30, 2026, Plaintiff's counsel wrote to Defendant Knutson, copying through the Assistant Attorneys General representing the Department in the *Antrim* litigation. Counsel's letter set out the statutory text, the Department's removal practices, the removal of [the plaintiff's] own device in July 2023, and the State's representation to the Seventh Circuit that neither the device nor the statute limits freedom of movement or travel. It asked the Department to answer two questions in writing by August 10, 2026: whether it would remove [the plaintiff's] device for his scheduled trip, and whether a monitored person is required to keep the device charged while outside of Wisconsin.

54. On August 7, 2026, Defendant Knutson responded in writing. She denied the request. She stated, for the first time, that "it is the Department's position that [the plaintiff] must keep the device charged while out-of-state." She disclosed that, according to Sex Offender Registry records, Plaintiff has made eighteen self-reported trips to other states since August 2020, all while wearing the device. She construed § 301.48(7m) to apply only to changes of residence, asserted that no statutory provision "permit[s]" termination of tracking for travel, and contended that removal for travel would be "unworkable" because the Department could not verify that the travel occurred.

55. Defendant Knutson's theory that removal requires affirmative statutory authorization cannot be reconciled with the Department's routine temporary removal of GPS devices for medical procedures—which no statutory provision authorizes either—or with its own removal of devices for travel in 2019, in 2023, and as recently as April 2026. Defendant Knutson's verification concern is answered in several ways. The statute itself requires reinstatement of tracking when a monitored person moves out of Wisconsin and later returns; the registry's existing self-reporting system already provides the Department with monitored persons' travel dates, as the letter confirms; and the Department has successfully administered temporary travel removals in the past, including for Plaintiff.

56. But for the Department's policy, [the plaintiff] will travel to Hawaii on November 29, 2026, returning December 5, 2026. The Department's policy forces him to choose between forgoing his 30th-anniversary trip and enduring a week-long transpacific journey with a government tracking device locked to his ankle—a device that will complicate airport security screening, that must be tethered to a

> wall outlet for hours at a time, and that marks him, in front of his family and strangers alike, as a monitored person, even though the State of Wisconsin concedes it has no authority whatsoever to restrict where he goes.
>
> 57. [The plaintiff] travels out of state frequently. Between March 2025 and July 2026 alone, he took at least ten out-of-state trips—to Arizona, Washington, Texas, and Illinois for work and family events; to Indiana four times to visit his daughter; and to Florida twice, in June and July 2026, to be with his son after a serious car accident—each reported in advance by email to his registry specialist. He took many out-of-state trips in 2024 as well, and since March 2018 he has traveled to Illinois approximately twice every week for his work. Defendant Knutson's August 7 letter itself counts eighteen reported trips since August 2020. Throughout all of this travel, [the plaintiff's] GPS device has remained attached to his ankle, charged, and operational. He intends to continue traveling out of state, beginning with the November 2026 anniversary trip, and the Department's policy will injure him on every such trip unless it is enjoined.

Id. at ¶¶37-57.

The complaint asks the court to certify the class under Federal Rule of Civil Procedure 23, declare that the challenged policy violates the Fourth Amendment (on its face and as applied to the plaintiff and the class), enjoin the defendant from continuing to enforce the challenged policy and require the defendant to remove class members' GPS devices while they are temporarily traveling out of state "upon reasonable notice," require the defendant to expunge GPS data collected from the plaintiff and class members collected while they are out of state, enter judgment in favor of the plaintiff and the class members and award the plaintiff fees and costs. Id. at 21-22.

## II. Plaintiff's Motion for Preliminary Injunction (Dkt. No. 4)

Three days after the plaintiff filed the class action complaint, he filed Plaintiff's Motion for A Preliminary Injunction and for Expedited Briefing. Dkt.

No. 4.[1] The motion asked the court to enjoin defendant Grace Knutson (the director of sex offender programs for the DOC) from enforcing against the plaintiff its "policy" of refusing to remove GPS monitors for temporary, out-of-state travel. Id. at 1. He asked the court to order the defendant to remove the plaintiff's GPS monitor for "the duration of his trip to Hawaii, scheduled for November 29 through December 5, 2026," and to reinstall it "promptly upon his return to Wisconsin." Id. The motion emphasized that the plaintiff sought this relief for himself alone, not on behalf of the class. Id. The plaintiff filed a brief in support of the motion, dkt. no. 5, and various supporting documents, dkt. nos. 5-1 through 5-7, 6-7. The defendant filed a brief in opposition. Dkt. No. 20. On November 3, 2026, the plaintiff filed a reply brief in support of the motion. Dkt. No. 23. The court held a hearing on November 10, 2026; the plaintiff testified on his own behalf, and called defendant Knutson as his second witness. Defense counsel questioned both the plaintiff and Knutson, but did not call any other witnesses. Both parties provided argument at the close of the evidence.

[1] In the August 19, 2026 motion for preliminary injunctive relief, the plaintiff asked the court to set an expedited briefing schedule. Dkt. No. 4 at 3. On October 7, 2026—shortly after the complaint had been served on the defendant and defense counsel had filed her notice of appearance—the plaintiff filed an expedited motion for a hearing and to set a briefing schedule. Dkt. No. 10. The defendant did not oppose the motion, and the court granted it on October 15, 2026. Dkt. No. 14. The motion has been fully briefed since November 3, 2026. The court thus has granted the part of the plaintiff's October 19, 2026 motion seeking an expedited briefing schedule. (The defense has filed a motion to dismiss the case. Dkt. No. 15. That motion will be fully briefed in the next couple of weeks.)

A. Summary of the Parties' Arguments

1. *Plaintiff's Opening Brief and Supporting Documents*

The plaintiff filed an affidavit attesting to the fact that in 2011, he was convicted "on two separate occasions, of First-Degree Sexual Assault of a Child for offenses that occurred in 1997." Dkt. No. 5-3 at ¶3. He averred that he had completed his prison sentence in 2017, completed his community supervision in 2020 and is not currently on any form of criminal justice supervision. Id. at ¶3. He averred that, as required by Wisconsin law, he'd been wearing a GPS ankle monitor continuously "since [he] became subject to" the monitoring requirement. Id. at ¶4. He said that he has been fully compliant with all program requirements. Id. at ¶5. He attested that in July 2023, he traveled to the Dominican Republic; before that trip, the DOC removed the GPS device, and re-attached it after he returned. He says that the Dominican Republic trip "took place without any incident or problem." Id. at ¶6.

The plaintiff also attested that in "connection with [his] past travel outside Wisconsin," DOC staff had told him that he wasn't required to keep the GPS device charged while out of state. Id. at ¶7. He averred that, in relation to the proposed anniversary trip to Hawaii,

> [t]he Department has now stated that [the plaintiff] must keep the device charged while out of state, which means [the plaintiff] must remain tethered to a wall outlet for hours at a time during a one-week vacation. And the device is visible and marks [the plaintiff] in public, in front of [his] family and strangers, as a person being monitored by the government, even though [he] completed his sentence years ago and [is] not under supervision of any kind.

Id. at ¶17.

The plaintiff also attached to his motion an April 20, 2022 article from the Cap Times, which described how Benjamin Braam—also subject to electronic monitoring but under no criminal justice supervision of any type—was allowed to have the ankle monitor removed when he traveled to Thailand in 2019. Dkt. No. 5-4 at 2. And the plaintiff attached an affidavit from someone named James Kaufman, who was subject to GPS monitoring but not under any criminal justice supervision. Dkt. No. 5-5. Kaufman described a ten-day trip he took overseas in April 2026, in which the DOC allowed his GPS device to be removed the day before he left and had it re-installed upon his return. Id. at ¶5.

In his brief in support of his motion for injunctive relief, the plaintiff argues that he is making a "small" request: "that the Department do for [the plaintiff's] anniversary trip exactly what it did for his trip to the Dominican Republic in July 2023, what it does routinely whenever a monitored person needs an MRI, and what Wisconsin law commands it to do for every monitored person who moves out of state permanently—dispatch its vendor to remove the GPS device from his ankle before he leaves, and put it back on when he returns." Dkt. No. 5 at 1. He asserts that the law "requires continuous tracking, [but] it does not expressly address temporary removal for travel . . ." Id. at 2. He says that when he pointed out to the DOC that he'd gotten the device removed for his 2023 trip to the Dominican Republic, the defendant advised him that GPS trackers no longer were removed for *any* travel and that the GPS specialist had said that this was a change in "GPS policy." Id. The

plaintiff emphasizes that he is *not* challenging the use of a continuous GPS tracking system in Wisconsin for persons convicted of certain sex offenses. Id. at 3.

The plaintiff provides background information regarding the program. He explains that the DOC's Electronic Monitoring Center administers the program; a third-party vendor, JusticePoint, services the devices. Id. JusticePoint employs thirty-four installer technicians who are available to remove devices for a medical emergency or a scheduled procedure. Id. (citing Dkt. No. 5-1 at 85).

The plaintiff points out that Wis. Stat. §301.48(7) provides for the removal of the device if he moves out of state. Id. at 2, 4. He asserts that "previously," the Department had "extended the same treatment to travel," discussing his own 2023 travel to the Dominican Republic, in which the Department allowed the removal of the device before he left. Id. at 4. He cites the Cap Times article in which a DOC spokesman confirmed that the DOC had removed a GPS device when a person traveled overseas for a month so as not to complicate airport security and his flight. Id. at 4 (citing Dkt. No. 5-4). He cites the Kaufman affidavit to argue that as recently as April 2026, the DOC had removed another registrant's device for a ten-day trip to Italy, France and Iceland. Id. (citing Dkt. No. 5-5 at ¶5).

The plaintiff explains that the DOC's policy regarding the removal of the device operated on two tracks until this year: the device remained on for domestic travel but it was removed for international travel. Id. at 5. He says

that on August 12, 2026, a program specialist confirmed that the GPS policy had changed such that the only reason the Department will allow removal of a GPS device is if the wearer is undergoing a medical procedure that requires GPS removal or if the person moves out of Wisconsin. Id. (citing Dkt. No. 5-5 at ¶6, 11). He says that as of the time he filed the motion, no one had explained to him who ordered this change or why, but he says that it was described to him as a "change in 'GPS policy,'" while Wis. Stat. §301.48 had not been amended. Id.

The plaintiff also emphasizes that once someone is off supervision, the Department has no authority to restrict their movement or travel; he says that he's been told by Department personnel that he isn't on probation or parole and can travel wherever he wishes. Id. at 6.

The plaintiff says that he emailed Steven Landreman, a corrections program specialist, on June 7, 2026, asking if the device could be removed before his planned anniversary trip. Id. Landreman replied, "I would think so." Id. (citing Dkt. No. 5-3 at ¶¶9-11). Landreman forwarded the question to Corrections Program Specialist Monica Lukach, who responded, "As far as Hawaii, that is part of the United States – the GPS will remain on." Id. The plaintiff says that Lukach cited Wis. Stat. §301.48(7), which discusses termination of lifetime tracking for people who have permanently relocated. Id. He says that when he pointed out that that statute said nothing about temporary travel, Lukach told him that neither she nor her colleague would respond to that issue any further. Id.

The plaintiff says that on June 19, 2026, he emailed the Director of the Sex Offender Program, defendant Grace Knutson, outlining the trip, describing his "unblemished compliance record" and explaining the hardships of "wearing the device on a transpacific trip built around the ocean" and offering alternatives. Id. at 6-7 (citing Dkt. No. 5-3 at ¶12). He says that Knutson cited Wis. Stat. §301.48(3)(a) and responded that the "the law does not allow for GPS to be removed for travel." Id. (citing Dkt. No. 5-3 at ¶13). When the plaintiff pointed out that it had been removed for his 2023 trip to the Dominican Republic, Knutson responded that it is no longer removed for any travel. Id. at 7 (citing Dkt. No. 5-3 at ¶14).

The plaintiff says that in July 2026, his attorney wrote to Knutson and the Assistant Attorneys General who represent the DOC in another GPS monitoring challenge case. Id. He says that his lawyers asked whether the Department would remove the GPS device for his anniversary trip and whether a monitored person would be required to keep the device charged while outside of Wisconsin. Id. He says that Knutson denied the request on two grounds: that "no statutory provision 'permit[s]' removal for travel, and that travel would be 'unworkable' because the Department could not verify that the travel occurred." Id. at 7-8. Knutson also told the plaintiff that it was the Department's position that he was required to keep the device charged while he was outside of Wisconsin. Id. at 7.

The plaintiff argues that GPS monitoring constitutes both a search and a seizure under the Fourth Amendment. Id. at 9. He concedes that the question

is whether the search is reasonable. Id. at 10. He anticipates that the Department would cite Belleau v. Wall, 811 F.3d 929 (7th Cir. 2016) and Braam[2] v. Carr, 37 F.4th 1269 (7th Cir. 2022), both of which upheld GPS monitoring against Fourth Amendment challenges. Id. at 10-11. But he argues that neither of those decisions "considered whether the balance they applied changes when a person who is no longer under supervision is physically outside Wisconsin," and that neither decision "addressed the Department's travel-removal policy, the Department's history of temporarily removing devices for travel, the statutory requirement to terminate tracking when a monitored person moves out of state, or the continued physical attachment of the device during travel." Id. at 11. He asserts that the question he raises is "whether the governmental interests that justified ordinary operation of the program remain sufficient to justify the same instruction when [the plaintiff] is out of state on vacation in Hawaii for a week's time." Id.

The plaintiff argues that the degree of intrusiveness GPS monitoring imposes on him does not diminish when he leaves Wisconsin—the device still is locked to his body twenty-four hours a day, it will remain with him through airport security and a long flight, he must keep it charged and it will continue to created a detailed record of his movements during the trip. Id. at 12-13. But he asserts that the government's interests are much weaker when a monitored person is outside of Wisconsin. Id. at 13. He says that to the extent that the

[2] Plaintiff "Braam" in the Seventh Circuit decision is the same Benjamin Braam described in the Cap Times article the plaintiff attached to his motion.

program is designed to deter people from committing crimes and help investigate them, Wisconsin has no investigative or prosecutorial authority in Hawaii. Id. He says that the fact that the statute requires that tracking be terminated altogether when a monitored person moves out of state (and to reinstate it if the person returns) "demonstrates that the State's asserted public-safety interest does not invariably require continuous monitoring whenever a covered person is physically outside Wisconsin." Id. at 14. He maintains that the Department's own practices—removing devices for people who have certain medical procedures scheduled and the past practice of removing the devices when the wearer traveled overseas—"refute any suggestion that temporary removal is operationally burdensome or incompatible with the monitoring program's objectives." Id. at 15. And he asserts that Wis. Stat. §301.48 does not address temporary removal for travel; he argues that "even if . . . § 301.48 establishes continuous monitoring as the statutory default, a statutory command does not answer whether application of that command is reasonable under the Fourth Amendment in the particular circumstances presented here." Id.

The plaintiff maintains that he will suffer irreparable harm if the court does not grant relief. Id. at 16. He says that if he does not receive relief, he would be required to wear the device for the duration of the trip, while it records his movements. Id. He says that no subsequent judgment could "restore that week free from the challenged intrusion or erase the experience of wearing the device through the anniversary trip itself." Id. And he argues that

there is no remedy at law—he sues the defendant in her official capacity for prospective relief and the Eleventh Amendment bars any claim for damages. Id. at 16-17. He says that the fact that in the past he has taken multiple trips wearing the device does not impact that analysis. He argues that the harm is "particularly concrete" under these circumstances because of the occasion—his and his wife's wedding anniversary. Id. at 17. The plaintiff asserts that if the court doesn't grant relief, "he must either forego the trip or take it with the device locked to his ankle—through airport security, on the beach, and in front of his family—during travel the State admits it has no authority to restrict." Id.

Finally, the plaintiff asserts that the balance of harms weighs in his favor. Id. He says the burden on the State is limited to JusticePoint performing two, routine service calls and the State losing a week's worth of data. Id. He says the harm to *him*, on the other hand, has, in some respects, already occurred—he had to request removal months in advance, he documented his history of compliance, offered verification and tried to resolve the issue without litigation. Id. at 18.

In closing, the plaintiff admits that courts rarely and cautiously issue injunctions that command a defendant to perform an affirmative act. Id. at 19. But he says that the relief he requests is narrow and specific—for the Department to remove the monitor before he leaves and put it back on after he gets back. Id. The plaintiff ends by asking that he not be required to post

security because there is no realistic risk of monetary loss to the defendant.[3] Id. at 20.

On October 21, 2026, the plaintiff filed a supplemental declaration in support of the motion, stating that he had canceled the trip to Hawaii "due to uncertainties with whether [he] will be compelled by the Wisconsin Department of Corrections to wear a GPS device;" he explained that instead, he and his wife planned to travel to the Grand Canyon and Las Vegas between November 28, 2026 and December 3, 2026. Dkt. No. 19 at 1. He explained that he continues to seek the injunction because the device complicates airport screening, requires him to "remain tethered to a wall outlet for hours at a time during [his] vacation" to stay charged, that the device is visible and marks him as a person being monitored by the government even though he is no longer under any type of supervision. Id. at 1-2. He also states that he "object[s]" to his location being monitored while he is outside of Wisconsin. Id. at 2.

On November 3, 2026, the plaintiff filed a second supplement to the motion. Dkt. No. 22. He explains that the trip plans had changed again; the couple now planned to leave Wisconsin on November 29 and return December 4, 2026. Id. at ¶3. He gives details of the trip—flight numbers, departure and arrival times, names of hotels. Id. at ¶4. He asserts that he will give the Department copies of airline and hotel confirmations before he leaves. Id. at ¶5. He explains that there is a device installer who lives near him; he says that because the couple's flight leaves so early in the morning on November 29, he

[3] The court has not required the plaintiff to post security.

would have to have the device removed the day before. Id. at ¶6. He also says that because the return flight doesn't land in Milwaukee until very late on December 4, he would have to have the device re-attached on December 5. Id. He provides extensive details about the kinds of verification he's (voluntarily) provided the Department for past trips—including verification when his trip to the Dominican Republic was terminated early because the country would not allow him entry. Id. at ¶¶7-9.

He also describes the difficulties he has encountered when traveling while wearing the device—being pulled aside and searched at metal detectors (which he says are in many places he goes, including concert venues, sports venues and hospitals). Id. at ¶11. He describes being pulled aside and searched at airports, with screeners exposing the device in front of strangers, frisking him and testing him with chemical strips. Id. at ¶12. He describes how he sometimes does not travel at all, or hangs back, when he's with a group or people who don't know his history. Id. at ¶13. He explains that many of his trips out of state have been to Illinois for work; he says he usually leaves and returns from those trips the same day. Id. at ¶14. And he says that before June 2026, he'd never asked the Department to remove the device for interstate, domestic travel because he didn't know he could. Id. at ¶15.

The plaintiff says that before he went to the Dominican Republic in 2023, Department personnel told him he didn't need to keep the device charged while he was outside of Wisconsin. Id. at ¶16. He says that, nonetheless, he's always kept it charged. Id. He reiterates that he's since been told that he *does* need to

keep the device charged, but that no one has ever told him when the Department's position changed or why. Id. at ¶18.

2. *Defendant's Opposition Brief*

The defendant responds that between 1998 and 2000, the plaintiff "repeatedly kissed, fondled, and had oral sex with his 7-year-old niece in places such as church and while traveling on vacation." Dkt. No. 20 at 1, 3. The defendant says that when the plaintiff was interviewed about the assaults, he stated that he "just let her [the 7 year old] call the shots." Id. (citing Dkt. No. 21-2). She says that the plaintiff received eight years' incarceration for his first conviction (First Degree Sexual Assault of a Child) and four years for the second conviction (First Degree Sexual Assault of a Child). Id. at 4. The defendant explains that the plaintiff completed community supervision in 2020 and will remain on GPS monitoring while he resides in Wisconsin. Id. In her attached declaration, the defendant says that the plaintiff has travelled outside of Wisconsin 466 times. Dkt. No. 21 at ¶22.

The defendant provides background information about the monitoring program and the device. Id. She explains that Wisconsin law requires GPS monitoring for people who have committed serious sex offenses, including crimes against children. Id. at 5 (citing Wis. Stat. §301.48(2)). The defendant explains that the plaintiff is subject to "law enforcement bulleting notices, which means that he is considered so risky that community law enforcement is notified" about where he lives and works. Id. (citing Wis. Stat. §§301.48(2)(a)7, 301.46(2m)). She says that Wisconsin uses the Attenti Tracker that weighs less

than 6.5 ounces and is 3.72 inches long by 1.82 inches high and 3.3 inches wide. Id. The defendant describes that the ankle straps are made of hypoallergenic synthetic material and can be adjusted. Id. at 6. She says that the GPS data is stored on secured servers and only DOC agents, the field supervisor, registry staff and certain Wisconsin Department of Health Services staff have access. Id. The defendant says that there are "not any special procedures or reviews of the record when an offender is off supervision and travels, in or out of the State of Wisconsin." Id. at 6.

The defendant points out that in addition to being monitored, the plaintiff is on the Wisconsin Sex Offender Registry, which makes the registered person's name, identity and physical description, conviction, vehicle, compliance status, primary address, supervisor and other information available to the public. Id. at 7. She emphasizes that although the plaintiff has no travel restrictions under Wisconsin law, he has significant international travel restrictions under federal law. Id. She recites that his passport states that he was convicted of a sex offense against a minor and that he must notify authorities twenty-one days before international travel. Id.; 22 U.S.C. §212b; Dkt. No. 21 at ¶21. She recounts in her attached affidavit that the Sex Offender Registry notifies the U.S. Marshals, which triggers an Interpol Green Notice (international alert). Dkt. No. 21 at ¶21. She explains that, in turn, can lead to heightened border security, secondary inspections, visa denials or refusals to enter. Id.

The defendant explains that the DOC's policy for travel is that the device must remain on and charged. Id. at 8. The defendant cites Wis. Stat. §§301.48(2)(a) and 3(a), which require the department to maintain lifetime tracking of certain individuals, and to implement a system of continuous GPS tracking of these individuals. Id. The defendant adds that it is impossible to keep up with removal and replacement every time someone travels into and out of Wisconsin—she says that (as of the time she wrote her brief in late October 2026) there were 4,263 offenders on GPS monitoring (1,106 were no longer on supervision and were on lifetime monitoring). Id.; Dkt. No. 21 at ¶¶3. She emphasizes that the plaintiff alone has traveled out of state 466 times. Id. The defendant argues that if a monitored person isn't wearing the device, the DOC cannot verify whether the individual actually gets on an plane, train or bus. Id. at 9.

The defendant admits that the Department's prior practice has been to remove the GPS device if the individual being monitored was traveling internationally. Id. She explains that this accommodation was allowed in part to troubleshoot the problems with charging the GPS device when traveling abroad. Id. According to the defendant, if an individual is travelling outside of Wisconsin and fails to charge the battery, he would not be automatically referred for prosecution. Id. Instead, the DOC would determine whether the individual knowingly or intentionally altered the device before possibly referring it to the local district attorney for consideration of whether there was a violation of Wis. Stat. §946.465. Id. at 10. The defendant adds that the

Department allows for the removal of the device for medical procedures because these procedures cannot be conducted with the device attached. Id.

The defendant asserts that the plaintiff cannot satisfy the first prong of the preliminary injunction test—he cannot make a strong showing that he is likely to succeed on the merits of his claim. Id. at 10. As the plaintiff predicted she would, the defendant cites the Seventh Circuit's decision in Belleau, emphasizing its holdings that persons convicted of sex offenses against minors have a diminished reasonable expectation of privacy under the Constitution, and that the loss of privacy caused by GPS monitoring is incremental and slight. Id. at 14. She emphasizes the appellate court's holding that due to the dangerous nature of convicted sex offenders' offenses and their high rates of recidivism, the State's interest in deterrence and protection of the public are high. Id. at 15. She points to the Belleau court's finding that simply being required to wear the device acts as a deterrent. Id. at 16.

The defendant also relies on the Seventh Circuit's decision in Braam, upholding the constitutionality of GPS monitoring in a challenge brought by offenders no longer on supervision (like the plaintiff). Id. She maintains that neither Belleau nor Braam limit their Fourth Amendment analysis to monitoring within Wisconsin's borders, and says that "the Seventh Circuit's analysis does not change because the offender temporarily leaves the state." Id. at 18. She explains that if a monitor is removed for out-of-state travel, the Department would have no way of knowing whether the wearer actually followed through with the travel plans, went where he said he was going to go

or returned early. Id. She cites Seventh Circuit precedent holding that the Fourth Amendment is not concerned with state borders. Id. at 19.

To the extent the plaintiff argues that the defendant somehow misapplied or misapprehended Wisconsin's GPS monitoring statute, the defendant argues that state law violations, standing alone, do not violate the Constitution. Id. at 21-23.

Regarding the plaintiff's argument that attachment of the device to his person constitutes a seizure under the Fourth Amendment, the defendant responds that there is no seizure because, as the plaintiff admits, he is free to leave and free to travel where he will. Id. at 25-26.

The defendant next argues that the plaintiff cannot satisfy the irreparable harm prong of the preliminary injunction standard. Id. at 27. She points out that the harms the plaintiff identifies—increased time and embarrassment at airport security, having his family and strangers see the device, being embarrassed at the beach or pool and having to charge the device—are harms he has suffered many times in the past. Id. She points out that he has not articulated problems with these issues in the past, and questions how the harms will be different on this trip, sufficient to justify a preliminary injunction. Id. She argues that for the plaintiff to be required to wear the device on this trip is nothing more than maintaining the *status quo*, and emphasizes that the Department does not review the collected GPS data in real time (it is reviewed upon request by Department staff or law enforcement). Id. at 27-28.

Finally, the defendant asserts that the court need not reach the balance of harms because the plaintiff cannot establish a reasonable likelihood of success on the merits or irreparable harm. Id. at 28. And she says if the court *did* reach the balance of harms, it would have to find that Wisconsin has a strong interest in monitoring sex offenders. Id. She explains why the statutory provision allowing removal when a monitored person moves out of state is warranted, and why the risks presented by unmonitored convicted sex offenders are reduced when the device is removed for a medical procedure, given the way the Department conducts such removals. Id. at 29. As for the Department's former practice of removing the device when a monitored person traveled internationally, the defendant emphasizes that the Department has stopped that practice because it determined that the practice posed too great a risk "to statutory compliance, public safety, and deterrence of sexual offenses . . ." Id. at 30.

3. *Plaintiff's Reply*

The plaintiff asserts that the defendant relies entirely on the Seventh Circuit's decisions in Belleau and Braam; he contends that the State's own filings in another case—Antrim v. Hoy, Appeal No. 25-1460—contradict that reliance. Dkt. No. 23 at 1. He says that in July 2025, the Department stated in Antrim that if a monitored person wanted to travel outside the country the Department would remove the device at customs and that monitored people could ask for the device to be removed for out-of-state trips of long duration, such as spending the winter out of the state. Id. He asserts that the

Department "cannot credibly maintain that it has an identical interest in collecting GPS location data when an individual is out of the state if it does not even review that data." Id. at 2. He maintains that the Department says that it requires monitored persons to charge the device while out of state to make sure it works when the person returns to Wisconsin. Id. He asserts that the defendant agrees that travel tickets can be used to confirm travel. Id.

As for the fact that the Fourth Amendment does not concern state borders, the plaintiff agrees that his Fourth Amendment rights are the same whether he's in Nevada or Wisconsin, but he says that the *government's* interest in collecting data on his whereabouts is not the same when he is out of state. Id. at 2-3. He argues that the government interests identified in Belleau are tied to Wisconsin—the need to alert police to an offense and the monitored person's awareness that he is being monitored. Id. at 3-4. He says the same is true of the interests identified in Braam. Id. at 4-5.

The plaintiff asserts that he has agreed to provide an itinerary in advance, proof of travel upon request, notice of any early return and prompt reattachment of the device upon return; he says that all of these things will address the Department's concern about verifying whether he's actually traveled to where he says he's going to travel and when he's returned. Id. at 6. He reiterates what he did in verifying the travel for his 2023 Dominican Republic trip—including advising the Department when the trip ended early. Id. at 6-7. He again points to the fact that under Wisconsin's statute, the Department is required to stop monitoring when a person moves out of state,

and to the fact that the Department has a practice of removing the devices for certain medical procedures. Id. at 7.

The plaintiff argues that "the Department's account of what the law permits has shifted with the audience." Id. at 9. He says that in 2019, the Department told Kaufman that the statute allowed the device to be removed only when a person moved out of state. Id. He says that in 2025, the State told the Seventh Circuit in Antrim that monitored persons could ask for the device to be removed for international travel and for extended domestic, out-of-state travel. Id. He describes other changes in Department "policy," and says, "[a]n interest described this inconsistently, and abandoned and revived without explanation, cannot justify continuous tracking of a man who, by the State's own account, faces 'no travel restrictions under Wisconsin's lifetime monitoring laws.'" Id. at 10 (citing Dkt. No. 20 at 7).

The plaintiff says that he is *not* arguing that the Department's "policy" violates the GPS monitoring statute and that he is *not* asking the court to enforce Wisconsin law. Id. at 10. Rather, he says that "the policy, as applied to his temporary travel, is an unreasonable search under the Fourth Amendment." Id. He says that either the statute requires continuous tracking during temporary travel or it doesn't; he says if it does, his claim "is a Fourth Amendment challenge to the statute as applied to him . . . ." Id. He says if it doesn't, his claim is a Fourth Amendment challenge to a policy of the Department. Id. He says that he cited Wis. Stat. §301.48(7m)—the provision of the statute that requires termination of monitoring when a monitored person

moves out of state—as an example of the weakness of the State's interest. Id. at 11.

Although the plaintiff argued in his opening brief that the attachment of the device constituted a seizure under the Fourth Amendment, he argues on reply that "[t]he Court . . . need not decide whether a hypothetical device that remained physically attached but collected no location information would independently violate the Fourth Amendment." Id. at 12. He says that that is not the search he's asking the court to enjoin. Id. He argues that if the court does reach the seizure issue, he has cited caselaw demonstrating that "termination of movement is not necessary for every seizure." Id.

As for irreparable harm, the plaintiff argues that the harm he will suffer is not "a mishap at an airport; it is the search and seizure itself, and the location record created during the trip cannot be uncollected after the fact." Id. at 13. He then goes on to reiterate the injuries he has suffered in the past at airports, concert and sports venues, hospitals, *etc*. Id. at 14.

As to the balance of harms, the plaintiff says that he is asking for one removal and one installation for one trip; he says the Department's concerns about what might happen if all monitored-but-not-on-supervision persons decided to travel out of state at once "addresses a rule no one has requested." Id. at 14. He says that the Department's concerns about verifying his return will be addressed by his self-reporting and the reinstallation of the device. Id. at 14-15.

B. Discussion

1. *Legal Standard*

A preliminary injunction is an "extraordinary remedy" for which there must be a "clear showing" that the plaintiff is entitled to relief. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)). To obtain a preliminary injunction, a plaintiff must show that (1) he has some likelihood of success on the merits of his claim; (2) traditional legal remedies would be inadequate; and (3) he likely will suffer irreparable harm in the absence of preliminary relief. Mays v. Dart, 974 F.3d 810, 818 (7th Cir. 2020). If the plaintiff can make that showing, the court then must balance the harm to each party and consider the public interest if the court were to grant or deny the motion. Korte v. Sebelius, 735 F.3d 654, 665 (7th Cir. 2013). The balancing process involves a "'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." Mays, 974 F.3d at 818 (citing Ty, Inc. v. Jones Grp., Inc., 237 F.3d 891, 895 (7th Cir. 2001)).

A "mandatory" preliminary injunction is "an injunction requiring an affirmative act by the" non-moving party. Graham v. Medical Mut. Of Ohio, 130 F.3d 293, 295 (7th Cir. 1997). "Because a mandatory injunction requires the court to command the defendant to take a particular action, 'mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued.'" Id. (quoting Jordan v. Wolke, 593 F.2d 772, 774 (7th Cir. 1978)). See also, Mayberry v. Neal, Appeal No. 25-1219, 2026 WL 2517325, at *5 (7th Cir.

August 26, 2026) (". . . mandatory injunctions—requiring an affirmative act by the defendant—are 'ordinarily cautiously viewed and sparingly issued.'").

2. *Likelihood of Success on the Merits*

To obtain the extraordinary relief of a preliminary injunction, the plaintiff must show that he has some likelihood of success on the merits of the claim alleged in his complaint. The complaint alleges that the Department's "policy" of refusing to remove the GPS device for temporary, domestic, interstate travel "violates the Fourth Amendment rights of Plaintiff and the class both on its face and as applied." Dkt. No. 1 at ¶69. It asks the court to enjoin the defendant from continuing to enforce the challenged "policy" and to require the defendant to remove class members' GPS devices while they are temporarily traveling out of state "upon reasonable notice." Id. at 21-22. Because he is seeking a "mandatory" injunction—the plaintiff is asking this court to require the defendant to take the affirmative action of removing his device before his trip out west—he must contend with the fact that requests such as his are "viewed cautiously and sparingly issued."

Both the plaintiff and the defendant have used the word "policy" to refer to the defendant's refusal to authorize the removal of the plaintiff's (and putative class members') devices for the purpose of temporary, domestic, out-of-state travel. Both also have used the word "practice" to refer both to the defendant's refusal to remove the device for temporary, domestic, interstate travel and for her past willingness to authorize removal of devices for temporary international travel and her current willingness to remove the device

for certain medical procedures. In the court's view, the word "practice" is more fitting, because it appears that what the plaintiff is challenging is the defendant's insistence on complying with the Wisconsin GPS statute in relation to his anniversary trip even though the defendant has not always insisted on such compliance in other circumstances. From that perspective, it makes sense to first review the statute.

"Wisconsin requires some sex offenders to wear GPS tracking devices for life, even after they have completed post-confinement supervision." Braam, 37 F.4th at 1270. The relevant statute, Wis. Stat. §301.48, is titled "Global positioning system tracking and residency requirement for certain sex offenders." Section 301.48(1)(d) defines "lifetime tracking" as "global positioning system tracking that is required for a person for the remainder of the person's life." Section 301.48(2) describes the conditions under which someone is subject to lifetime tracking, and the plaintiff does not dispute that he is subject to lifetime tracking. Section 301.48(3)(a) explains that the Department "shall implement a continuous global positioning tracking system to electronically monitor the whereabouts of persons who are subject to this system." Section 301.48(6) describes a procedure for a monitored person to petition to terminate the lifetime tracking after twenty years, and §301.48(7) allows the Department to petition to terminate lifetime tracking if the person monitored is permanently incapacitated. Wis. Stat. §301.48(7m) requires the Department to terminate the lifetime tracking if the person moves out of state. The statute does not provide

for temporary termination of tracking, or removal of a device, for any type of travel or for medical procedures.

As stated above, the complaint alleges that the defendant's *policy* of refusing to remove the device "violates the Fourth Amendment rights of Plaintiff and the class both on its face and as applied." Id. at ¶69. But in his *reply* brief, the plaintiff says that either the *statute* requires continuous tracking during temporary travel or it doesn't; he says if it does, his claim is a Fourth Amendment challenge to the *statute* as applied to him, whereas if it doesn't, his claim is a Fourth Amendment challenge to a *policy* of the Department. The claim in the *complaint* challenges only the defendant's "policy" of refusing to remove the device for temporary, domestic, interstate travel; unlike the reply brief, it does *not* specifically articulate a Fourth Amendment challenge to Wis. Stat. §301.48.

This muddies the waters. In his briefing on his request for a preliminary injunction, the plaintiff focuses solely on the *defendant's* actions. He does not analyze the language of the *statute* to determine whether it does or does not require continuous monitoring. He has shed little light on whether he is arguing that the statute requires continuous monitoring and thus that he is challenging the *statute* as violating the Fourth Amendment as applied to him.

It is possible to read the statute to require continuous monitoring. The statute requires the Department to "implement a continuous global positioning tracking system to electronically monitor the whereabouts of persons who are subject to this system;" it is not clear why the legislature would require the

Department to "implement" such a system if it did not intend the Department to continuously track the whereabouts of monitored persons. Merriam-Webster defines the word "continuous" as "marked by uninterrupted extension in space, time, or sequence." www.merriam-webster.com/dictionary/continuous.

The statute's structure also shows that the legislature knew how to make exceptions to the continuous monitoring requirement—it made three of them. A monitored person may seek termination of the requirement after twenty years. The Department may seek termination for monitored persons who are permanently physically incapacitated. And the Department must terminate monitoring if a person moves out of state. Had the legislature wanted to make exceptions for temporary international or domestic travel, or for medical procedures, it could have done so.

So it is possible that the plaintiff intended to challenge the constitutionality of Wis. Stat. §301.48 as applied to him. "To succeed on an as-applied challenge, the moving party must demonstrate that the statute is unconstitutional as applied to the facts of the case and not necessarily any set of hypothetical facts." United States v. Gonzalez, Case No. 25-cr-2, 2026 WL 2138067, at *1 (E.D. Wis. July 24, 2026) (citations omitted). But if that *is* the challenge the plaintiff intended to make, it is not clear to the court that he specifically articulated that challenge in the complaint. And the question the court must answer for the first prong of the injunctive relief standard is whether the plaintiff has some likelihood of success on the merits of the claim he raised in his *complaint*. The court cannot conclude that the plaintiff has

some likelihood of succeeding on a claim that Wis. Stat. §301.48 violates the Fourth Amendment as applied to him when he does not appear to have asserted that claim in the complaint and has not framed his arguments in his request for injunctive relief in that way.

Even if the plaintiff had framed his claim and arguments as an as-applied challenge to the constitutionality of the statute itself, he would be hard-pressed to show a likelihood of success on the merits. The plaintiff began his preliminary injunction argument by asserting that GPS monitoring itself constitutes a search under the Fourth Amendment. This is true, as far as it goes. In Grady v. North Carolina, 575 U.S. 306, 309 (2015), the Supreme Court held that a state "conducts a search when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements."[4] But the Grady court went on to explain that "conclusion . . . does not decide the ultimate question of the program's constitutionality." Id. at 310. The Grady court explained that "[t]he Fourth Amendment prohibits only *unreasonable* searches." Id. It explained that whether a search is reasonable under the Fourth Amendment "depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." Id. The question in this case is not whether §301.48's GPS monitoring requirement constitutes a search, but whether that search is reasonable.

---

[4] Although the plaintiff also argues that the device constitutes a seizure, he concedes in his reply brief that the court need not decide that issue because Grady establishes that the monitoring is a search. Dkt. No. 23 at 11.

As the briefing makes clear, the Seventh Circuit has been asked to address that question at least three times, and has answered it at least twice. In Belleau, 811 F.3d at 930-31, the plaintiff had been convicted in Wisconsin state court of sexually assaulting a child over several years; he was convicted, sentenced, released to supervision and then reoffended while on supervision. Eventually he was released from prison but then was civilly committed as a sexually violent person. Id. at 931. While he was under civil commitment, the Wisconsin legislature enacted Wis. Stat. §301.48. Id. Upon the plaintiff's release from civil commitment, he was subject to the statute and was required to wear a GPS monitoring ankle bracelet. Id.

Belleau sued the officials of the DOC who administered the monitoring statute, arguing that "the statute violates both the Fourth Amendment to the Constitution" and the *ex post facto* clause. Id. The Seventh Circuit explained

> [t]he type of anklet worn by the plaintiff is waterproof to a depth of fifteen feet, so one can bathe or shower while wearing it. It must however be plugged into a wall outlet for an hour each day (while being worn) in order to recharge it. There are no restrictions on where the person wearing the anklet can travel, as long as he has access to an electrical outlet. Should he move away from Wisconsin, he ceases to have to wear it. . . .
>
> When the ankleted person is wearing trousers the anklet is visible only if he sits down and his trousers hike up several inches and as a result no longer cover it. The plaintiff complains that when this happens in the presence of other people and they spot the anklet, his privacy is invaded, in violation of the Fourth Amendment, because viewers assume that he is a criminal and decide to shun him.

Id. at 931-32.

Citing Grady, the Seventh Circuit concluded that "electronic monitoring of sex offenders is permitted if reasonable . . . —and that standard is satisfied in this case." Id. at 932 (citations omitted). In response to Belleau's argument that because he was no longer on any form of supervision, there was no lawful reason for him to have to wear the ankle monitor, the court found that the nature of his offenses—sexual molestation of pre-pubescent children—involved compulsive and often uncontrollable behaviors, with little evidence that those behaviors declined with age and evidence of significant underreporting of sex crimes against children. Id. at 932-935. The Belleau court also found that the incremental effect of the monitoring statute on Belleau's privacy was "slight given the decision by Wisconsin—which he does not challenge—to make sex offenders' criminal records and home addresses public." Id. at 935.[5] The court found that Belleau's privacy "ha[d] already been severely curtailed as a result of his criminal activities," and that "[t]he additional loss from the fact that occasionally his trouser leg hitches up and reveals an anklet monitor that may cause someone who spots it to guess that this is a person who has committed a sex crime must be slight." Id.

The court went on to explain:

> For it's not as if the Department of Corrections were following the plaintiff around, peeking through his bedroom window, trailing him as he walks to the drug store or the local Starbucks, videotaping his every move, and through such snooping learning (as the amicus curiae brief of the Electronic Frontier Foundation would have it) "whether he is a weekly church goer, a heavy drinker, a regular at the gym, an unfaithful husband," etc. (quoting *United States v.*

[5] Referring to Wisconsin's Sex Offender Registry, with which the plaintiff in this case also must register.

> *Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010)). The fruits of such surveillance techniques would be infringements on privacy that the Supreme Court deems serious. See, e.g., *Kyllo v. United States*, 533 U.S. 27, 33-36 . . . (2001); see also *Katz v. United States*, 389 U.S. 347, 361 . . . (1967) (Harlan, J., concurring); *United States v. Jones*, --- U.S. ----, 132 S. Ct. 945, 954-56 . . . (2012) (Sotomayor, J., concurring); *id* at 963-64 (Alito, J., concurring). But nothing of that kind is involved in that case, quite apart from the fact that persons who have demonstrated a compulsion to commit very serious crimes and have been civilly determined to have a more likely than not change of reoffending must expect to have a diminished right of privacy as a result of the risk of their recidivating—and as Justice Harlan explained in his influential concurrence in the *Katz* case, the only expectation of privacy that the law is required to honor is an "expectation … that society is prepared to recognize as 'reasonable.'" 389 U.S. at 361 . . .
>
> Rather, every night the Department of Corrections makes a map of every anklet wearer's whereabouts that day so that should he be present at a place where a sex crime has been committed, or be hanging around school playgrounds or otherwise showing an abnormal interest in children not his own, the police will be alerted to the need to conduct an investigation. But the main "objective of the searches [the mapping, in this case] was [not] to generate evidence *for law enforcement purposes*," as in *Ferguson v. City of Charleston*, 532 U.S. 67, 83 . . . (2001) (emphasis in original), but instead to deter future offenses by making the plaintiff aware that he is being monitored and is likely therefore to be apprehended should a sex crime be reported at a time, and a location, at which he is present.

Id.

The Belleau court disagreed that a GPS device burdens liberty by continuously surveilling the wearer's activities; it emphasized that a GPS device only identifies locations, not what the wearer is doing at those locations. Id. at 936. And it reminded readers that the burden of that identification needed to be balanced against society's interests, which the court described as the value of the location information in assisting law enforcement in investigating

offenses, excluding GPS wearers as suspects of other offenses and reducing recidivism. Id. For these reasons, the court concluded that the statute's requirement of GPS monitoring did not constitute a violation of the Fourth Amendment. Id. at 937.

In a concurring opinion, Judge Flaum agreed that Wis. Stat. §301.48 "[did] not violate the Fourth Amendment" as applied to Belleau. Id. at 938. His decision was shaped in part by the fact that "sex offenders who target children pose a uniquely disturbing threat to public safety." Id. He found that "their crimes are especially destructive and their rate of recidivism is particularly high." Id. He cited the trauma that child victims experience from the assault—trauma that they may carry with them for their entire lives. He reasoned that these factors "place the state's interest in combating these particular sex offenses beyond that of general crime control" and that the "state's strong interest in protecting children from sexual predators is paramount." Id. He also considered the nature of GPS technology, admitting that it could alter the relationship between citizens and the government in ways "inimical" to a democratic society, but observing that it could replace more invasive forms of supervision (such as long prison sentences). Id. at 939. He speculated that as the technology advanced, some burdens—like the bulk of the device or the charging time—might be reduced. Id.

Belleau alone casts doubt on the plaintiff's ability to show a likelihood of success on the merits. The Belleau court found the sorts of burdens the plaintiff in this case has described—having strangers see the device and make

assumptions about him, being embarrassed or humiliated by those assumptions, having to charge the device—"slight" compared to the State's interests in deterring child sex offenses. During his testimony at the November 10, 2026 hearing, the plaintiff provided more detail. He described that whenever he goes through airport security, he is pulled aside, often frisked and sometimes wiped down with chemical strips. He stated that on the trip out west, he would not go to the pool or wear shorts. He described the fact that it takes him ninety minutes to two hours to charge his device. These burdens are only incrementally more onerous than the ones described in Belleau. And the main state interest identified in Belleau—the very fact of the wearer having the monitor on acting as a deterrent to the kinds of conduct that resulted in the plaintiff's being required to wear the monitor—is just as strong in the plaintiff's case as it was in Belleau's. The main difference between the plaintiff in Belleau and the plaintiff here is that after Belleau was released from prison, he was civilly committed and a medical professional opined that he was unlikely to be able to change his behavior. That is not the case for the plaintiff here. But as the Seventh Circuit's next case addressing a challenge to the constitutionality of Wis. Stat. §301.48 shows, that distinction is not materially significant.

On December 17, 2019, this court denied a preliminary injunction motion challenging Wis. Stat. §301.48's lifetime monitoring requirement for repeat sex offenders under the Fourth and Fourteenth Amendments. Braam v. Carr, Case No. 19-cv-396 (E.D. Wis.), Dkt. No. 32. On appeal, the Seventh

Circuit agreed that the plaintiffs could not show a likelihood of success on the merits of their Fourth Amendment claim. Braam, 37 F.4th at 1271.

The plaintiffs in Braam were individuals who had been convicted of multiple sex offenses involving children and thus were required to submit to lifetime monitoring under Wis. Stat. §301.48. Id. They had sued the Secretary of the Department of Corrections, asserting that Wis. Stat. §301.48 violated their Fourth Amendment rights, and sought preliminary injunctive relief. Id. As was this case, Braam was filed as a putative class action, with the class described as "offenders who are no longer under post-confinement supervision by the Department of Corrections but remain subject to the monitoring requirement." Id. at 1272. The appellate court's description of the program in 2022—the year it decided Braam—is similar in many respects to the defendant's description of the program in this 2026 case:

> The monitoring program requires the plaintiffs to wear an ankle GPS monitor for the rest of their lives unless they permanently move to a different state. The monitor is unobtrusive and fits under clothing. It has a maximum battery life of 80 hours, and the Department of Corrections recommends that offenders charge the monitor for one hour per day. A sex offender can request termination of tracking after he has worn the monitor for 20 years.
>
> The ankle monitor transmits GPS data of a sex offender's location to law enforcement, but the data is not reviewed in real time. Instead, officers typically analyze the data every 24 hours to check if an offender was present at or near schools, playgrounds, crime scenes, or anywhere else that might arouse suspicion. The ankle monitor tracks location only; it does not record video or sound. It does not restrict where an offender may go, nor does it alert law enforcement when a sex offender is in or near any particular place.

Id. at 1272.

The Braam court quickly turned to its decision in Belleau, providing details about that decision. Id. at 1273-75. It explained that on appeal, the Braam plaintiffs had argued that Belleau was distinguishable; the Seventh Circuit disagreed. Id. at 1274. It concluded that the only difference between the two cases "is that *Belleau* concerned the subsection of the statute that imposes the monitoring requirement on sex offenders who have been discharged from civil commitment, whereas this case concerns the provision imposing the monitoring requirement on repeat sex offenders." Id. The court found that difference "immaterial," holding that "Wisconsin has the same strong interest in monitoring both groups of sex offenders" and that "both groups have the same diminished privacy expectations." Id. It reiterated its finding from Belleau: "Wisconsin's primary interest in monitoring sex offenders is public protection, achieved by deterring convicted sex offenders from committing additional sex crimes. Our conclusion in *Belleau*—that this strong governmental interest justifies Wisconsin's monitoring program—applies equally here." Id. at 1274-75.

The plaintiffs in Braam argued that they were less dangerous than Belleau because they'd not been civilly committed as sexually violent persons. Id. at 1275. The court rejected that argument, observing that "Wisconsin also has a strong public safety interest in monitoring repeat sex offenders for deterrence purposes." Id. The court also rejected the parties' efforts to rely on competing social science research about the efficacy of GPS monitoring in deterring persons such as themselves; the court found that its role was to

decide whether, "against the backdrop of *Belleau*, the plaintiffs have demonstrated a likelihood of success on their claim that the statutory GPS monitoring requirement is unreasonable." Id. The Braam court rejected the plaintiffs' other arguments and found that the lower court correctly had concluded that the plaintiffs were not likely to succeed on the merits of their claims. Id. at 1275, 1272.

On September 23, 2020, while this court's denial of injunctive relief in Braam was on appeal to the Seventh Circuit, the substantive claims in the case were reassigned to Judge Brett Ludwig. Case No. 19-cv-396-bhl (E.D. Wis.). After the Seventh Circuit had affirmed this court's denial of the plaintiffs' request for preliminary injunctive relief, id., dkt. no. 39, Judge Ludwig certified a class, but the only remaining named plaintiff was Alton Antrim, id, dkt. nos. 58, 62. In May 2024, the parties filed cross-motions for summary judgment, id., dkt. nos. 81 (defense motion); 88 (plaintiffs' motion), and Judge Ludwig granted the defendant's motion, finding that the case was indistinguishable from Belleau, id., dkt. no. 107 at 9. In his summary judgment ruling, Judge Ludwig explained that Antrim's sole claim was that "Wisconsin's lifetime GPS monitoring of sex offenders under Wis. Stat. §301.48(2)(a)(7) violates the Fourth Amendment." id. at 4. Citing Belleau and Braam, Judge Ludwig observed that the Seventh Circuit had rejected many of the arguments Antrim had made. Id.

On March 19, 2025, plaintiff Antrim filed a notice of appeal, id., Dkt. No. 109; that appeal remains pending before the Seventh Circuit.[6]

The Seventh Circuit's decisions in Belleau and Braam provide the plaintiff with little fodder for an argument that Wis. Stat. §301.48 as applied to him is unreasonable regarding the burdens it imposes. Like those plaintiffs, the plaintiff here must wear a device that, when exposed to others—whether by the accidental hiking up of a pant leg or by an more stringent TSA screening at the airport—causes him shame and embarrassment, making him feel shunned or ostracized. Like those plaintiffs, he must spend some part of his day charging the device.[7] The two burdens he described that were not mentioned in Belleau or Braam were the increased time it takes him to go through the TSA line at airports and his reluctance to wear shorts or go in the pool while on his

[6] In both his written submissions and his oral argument at the November 10, 2026 hearing, the plaintiff argued that the Department had conceded in the Antrim briefing that it had allowed devices to be removed for international travel, had allowed them to be removed for medical procedures and had allowed monitored persons to ask for a device to be removed in the event of extended out-of-state domestic travel, such as wintering in a warmer location. The court will address those issues when it addresses the plaintiff's "facial" challenge to the alleged "policy" of refusing to remove the device for short-term, out-of-state, domestic travel.

[7] During the November 10, 2026 hearing, both the plaintiff and the defendant testified that the device the plaintiff wears is supposed to hold a charge for forty hours. The plaintiff expressed concern that the device would not hold a charge for that long and said that he charged the device every day, in an abundance of caution—a task that he said took ninety minutes to an hour. The defendant testified that she'd not heard complaints about the device failing to hold a charge for forty hours. But she also testified that in the past, she had advised persons being monitored to charge the device every day, for peace of mind. She said they could plug the device in in the evening while watching television or while they were sleeping.

anniversary trip because of the embarrassment of having people see the device and draw conclusions.

At best, these burdens are only incrementally heavier than those described in Belleau and Braam. Perhaps more to the point, they are burdens he bears in all sorts of contexts within the state of Wisconsin, such as when he attends a concert or sporting event or enters a building with a metal detector. They are burdens he bears when he flies to other states for work (which he does fairly frequently as a freelance graphic designer) or for family events (such as his child's horse show). And he bears other stigmatizing burdens. His name appears on the registry website, along with personal information such as his name, physical characteristics, convictions, vehicle information, compliance status, primary address, supervising agency and whether a special bulletin notice was released to law enforcement. Wis. Stat. §301.45(2)(a).

Some of the burdens the plaintiff bears are lighter—literally. The GPS device weighs less than 6.5 ounces and is waterproof up to 66 feet. Dkt. No. 21 at ¶¶4-6. The device does not emit or record sounds. Id. at ¶7. The plaintiff did not testify that the device chafes his skin, causes blisters or prevents him from physically engaging in activities. It is not visible when the plaintiff is wearing long pants; during the November 10, 2026 hearing he had to stand up and pull up his pant leg to show the device to the court. And as a convicted sex offender, the plaintiff still has a diminished expectation of privacy.[8]

[8] At the November 10, 2026 hearing, the plaintiff's counsel argued that in Chatrie v. United States, 609 U.S. 605 (2026), the Supreme Court had put paid to the idea that GPS monitoring constitutes a slight, or diminished, intrusion

But the plaintiff insists that neither Belleau nor Braam control because neither case considered whether the same analysis applies where the person being monitored is physically outside of Wisconsin. The plaintiff argues that the state's interests in monitoring are weaker while he is outside of Wisconsin. To the extent that the court in Belleau focused on the state's interest in deterrence and detecting new offenses, the plaintiff says that the State has admitted that it reviews the data retrospectively and not in real time. He argues that Wisconsin's jurisdiction to investigate or prosecute crimes does not extend beyond the state, citing Wis. Stat. §939.03(1).

The plaintiff also emphasizes that the statute requires the tracking to terminate when an individual permanently moves outside of Wisconsin, and that the Department allows the device to be removed for medical procedures. According to the plaintiff, any argument that continuous tracking serves the State's interests is undermined by the fact that the DOC has allowed devices to be removed in the past for international travel, for medical procedures and possibly even for longer-term but temporary domestic travel. The plaintiff emphasizes that the judgment in Antrim and the pending appeal of that judgment do not foreclose this litigation because the plaintiff in Antrim challenged the constitutionality of lifetime monitoring, while the plaintiff challenges only the Department's refusal, arising from the DOC's recent refusal and "policy change," to remove devices for temporary out-of-state travel.

---

on a person's privacy. But Chatrie did not involve the privacy expectations of convicted sex offenders, who have a diminished expectation of privacy under the law.

Again the plaintiff blurs the lines between an argument that the *statute* is unconstitutional as applied to him and an argument that some Department policy or practice violates the Fourth Amendment on its face. The plaintiff's arguments that the State has a reduced interest in deterring child sex offense crimes when the monitored person is temporarily outside the state of Wisconsin are relevant to a claim that the statute is unconstitutional as applied to the plaintiff when he is outside the state. As the court has explained, it is not clear that is the claim the plaintiff made in his complaint. But even if it was, the plaintiff's arguments are not persuasive. Judge Posner found in Belleau (as did Judge Flaum in his concurrence) that the very fact of having to wear an ankle monitor has a deterrent effect. That deterrent effect of reducing or preventing child sex crimes by a Wisconsin citizen is a valid state interest to Wisconsin. It is true that Wisconsin would not have the jurisdiction or authority to investigate or prosecute child sex crimes that a Wisconsin citizen might commit in another state, but Judge Posner held in Belleau that that is not the primary state interest served by requiring GPS monitoring.

In their pleadings and at the November 10, 2026 hearing, the parties spent a great deal of time on whether Wisconsin has an interest in ensuring that a monitored person who temporarily travels to another state actually leaves; the plaintiff dismisses this as a valid state interest, arguing that the State could protect that interest by demanding verifying travel documents such as plane tickets, boarding passes and hotel receipts. That argument assumes that all monitored persons would be willing to provide such verification (they're

not required to—they're free to travel wherever they like without restriction or explanation) and that such verifying documents actually prove that the person traveled as reflected on the ticket or receipt. As courts, prosecutors and defense counsel know from drug and human trafficking cases, it is possible to buy an airline ticket and get a boarding pass without ever boarding a flight, and it is possible to reserve and pay for a hotel room in which one never stays. Wisconsin *does* have an interest in knowing whether a convicted sex offender is in the state. Its ability to protect that interest is greatly diminished if the device is removed for temporary, domestic, out-of-state travel.

The defendant also has proffered evidence regarding the burden of removing and reinstalling the device on more than one thousand monitored persons who are not on supervision if the devices have to be removed every time a monitored person travels out of state. The plaintiff alone has traveled outside of Wisconsin over 400 times. It is likely that there are many monitored, unsupervised persons who don't travel so frequently, but others may travel more. The plaintiff insists that he's not asking that the device be removed every time he leaves the state; he says he's asking only to have it removed this one time, for this one trip. But that argument ignores reality; the putative class is asking the court to require the defendant to remove all class members' GPS devices while they are temporarily traveling out of state "upon reasonable notice." That relief will place an arguably impossible administrative burden on the Department, interfering with its ability to comply with the statute.

So—to the extent that the plaintiff meant to claim that Wis. Stat. §301.48 violates the Fourth Amendment as applied to him, the court finds that he does not have a likelihood of success on the merits. He did not make this specific claim in the complaint. Even if he had, the Seventh Circuit's decisions in Belleau and Braam have held that the statute does not violate the Fourth Amendment, and the plaintiff's arguments that the Seventh Circuit's reasoning as to the State's interests does not apply when he is out of state are not persuasive.

The other option is that the plaintiff meant to argue that the defendant's "policy" or "practice" of refusing to remove the device when monitored persons temporarily travel out of state is unconstitutional on its face. This is the argument that he *did* articulate in the complaint. This is the argument upon which he's focused his attention in briefing and at the November 10, 2026 hearing. But this argument is perplexing; as the court said above, it appears that the plaintiff is challenging the defendant's insistence on *complying* with the Wisconsin GPS statute.

As the court has discussed, the statute appears to require "continuous" monitoring, with only three exceptions—a move out of state, a monitored person's petition to terminate monitoring after twenty years and the Department's petition to terminate monitoring when the monitored person is physically incapacitated. The evidence in the record shows that despite this fact, there have been times in the past where the Department's practice has been to remove devices for monitored persons who are traveling internationally

(although it since has terminated that practice).[9] The evidence also shows that in the past and continuing to the present, the Department has had a practice of removing the devices for some types of medical procedures (such as MRIs or certain kinds of surgeries), even though the statute did not carve out an exception for such procedures.

The plaintiff's argument that the defendant's "policy" or "practice" of refusing to remove the GPS device for monitored persons temporarily traveling out of state violates the Fourth Amendment amounts to an argument that the defendant's insistence on complying with the statute violates the Fourth Amendment, though the statute itself has been found *not* to violate the Fourth Amendment.

The plaintiff asserts that the practice, or policy, violates the Fourth Amendment because the defendant's inconsistent compliance with the statute (along with the statute's express exception for monitored persons who move out of state) demonstrates that the State's interest in deterring child sex offenses is not strong enough to outweigh the plaintiffs' privacy interests. That argument is not persuasive. It appears that at times since the statute was passed in 2006, the Department has made pragmatic decisions about its ability to

---

[9] At the November 10, 2026 hearing, defendant Knutson testified that the Department had changed this practice in the wake of the passage of a Wisconsin law that would require registered sex offenders to wear a GPS monitor unless they can provide a permanent residential address. She testified that the Department decided that based on that change in the law, it should change its procedures. She testified that the change in procedure resulted from discussions about how to prove whether someone was or was not homeless, or was or was not living in Wisconsin.

enforce the statute in certain circumstances. It used to remove the devices when monitored persons were going to travel internationally because, for example, it was concerned about their ability to charge the device in other countries. It removes the device before certain medical procedures because the device would make it difficult or impossible for the monitored person to have that procedure. Those practical decisions by the Department do not prove that the State has a diminished interest in deterring child sex offenses. Nor does the fact that the legislature decided to carve out an exception to the monitoring requirement for those monitored persons who move out of Wisconsin. Although the plaintiff characterizes that exception as evidence that Wisconsin has a diminished interest in deterrence of child sex crimes when someone doesn't live in Wisconsin, there also likely were practical reasons for the exception, having to do with comity and jurisdictional authority.

Finally, the plaintiff argues that when the Seventh Circuit decided Belleau and Braam, it didn't consider whether its reasoning regarding the strength of the State's interest would be different if the monitored person was temporarily located somewhere other than Wisconsin. He is correct that the appellate court did not specifically address that issue. Instead, it found that Wis. Stat. §301.48 did not violate the Fourth Amendment. The plaintiff has not presented sufficient or compelling evidence that, had the Seventh Circuit considered the question of whether the statute violates the Fourth Amendment when the monitored person is temporarily out of state, it would have decided those cases differently.

Whether the plaintiff intended to claim that Wis. Stat. §301.48 violates the Fourth Amendment as applied to him, or to argue that the defendant's practice of complying with the continuous monitoring requirement when a monitored person temporarily travels out of state violates the Fourth Amendment on its face, the plaintiff has failed to make a showing that he has some likelihood of success on the merits.

3. *Irreparable Harm*

Although the court need not reach the irreparable harm prong of the injunctive relief analysis, it will do so for the sake of completeness.

The plaintiff argues that his injury is concrete, imminent and incapable of being repaired because his trip is scheduled November 29 through December 5, 2026. Dkt. No. 5 at 16. He argues that the harm arises from the constitutional violation itself—the recording of his location information. Dkt. No. 23 at 14, 15. The defendant responds that the plaintiff never has identified a problem with his GPS when going through airport security or in charging the device. Dkt. No. 20 at 27. According to the defendant, the plaintiff's arguments about irreparable harm are nothing more than speculation. Id. at 27. In his reply, the plaintiff says that he regularly is pulled aside and searched at metal detectors, that the screener exposes the ankle monitor to other travelers and that he never has asked to have the device removed for domestic trips because he didn't know he could ask. Dkt. No. 23 at 14, 15.

The plaintiff has not made a showing of irreparable harm. As the court has observed more than once, the defendant avers that the plaintiff has

traveled out of state hundreds of times. The plaintiff acknowledges that he travels outside Wisconsin regularly. At paragraph 18 of his declaration, the plaintiff states:

> 18. I travel outside Wisconsin regularly. Between March 2025 and July 2026 alone, I took at least ten out-of-state trips, each of which I reported in advance by email to my registry specialist, Steven Landreman: to Arizona in March 2025 for a work conference; to Indiana in September 2025 for my daughter's horse show; to Washington in October 2025 for a work conference; to Texas in March 2026 for a work conference; to Indiana in April, May, and June 2026 to visit my daughter; to Illinois in April 2026 for my daughter's horse show; and to Florida in June 2026 and again in July 2026 to be with my son after he was seriously injured in a car accident. I took many out-of-state trips in 2024 as well. In addition, since March 2018 I have traveled to Illinois approximately twice every week for my design work.
>
> 19. On every one of these trips, my GPS device remained on my ankle, charged, and operational. I did not request removal of the device for these trips; they were work and family obligations, and I accepted the burden and did my job. Department personnel have told me repeatedly, however, that I am not monitored on a daily basis.

Dkt. No. 6 at 5.

The plaintiff has identified only one occasion where he was allowed to travel without the device and that was for his international trip to the Dominican Republic (which the defendant previously had allowed subject to the restrictions identified under federal law). The plaintiff cites the difficulties with airport screening, the time spent charging the device and the stigma associated with having to wear an ankle monitor, but those are burdens that he carries even when he is in the state of Wisconsin and attends a sporting event or concert or enters any building with a metal detector. He must charge his device every forty hours (or, as he does for his peace of mind, daily)

regardless of where he is located. The stigma arises in all sorts of situations other than temporary travel to another state, such as attending a sporting event or concert with a metal detector, visiting a new doctor or wearing shorts in the summer, as well as from the fact that as a registered sex offender, his personal information appears on a website.

At the November 10, 2026 hearing, the plaintiff testified that this trip was different. He and his wife are taking it to celebrate their wedding anniversary. He testified that he wanted to give his wife the best possible anniversary celebration that he could give her, without worrying about whether he had to be plugged into a wall charging the device, or whether he could wear shorts or go to the pool, or whether they get pulled to the side at the airport. The court can understand the plaintiff's desire to have a few days without the burden of the device. But it does not prevent him and his wife from taking trips to exciting destinations, from seeing the sights, from enjoying restaurants or attractions or from being together. The plaintiff has not made a showing that if the court does not grant him the relief he requests, he will suffer irreparable harm.

4. *Legal Remedies*

The plaintiff argues that traditional remedies at law are not available because the Eleventh Amendment bars a damages award against the state; injunctive relief is the only available remedy. Dkt. No. 5 at 17. The court agrees, but that fact is irrelevant because the plaintiff has not made the required showing on the first two prongs of the injunctive relief standard.

### 5. *Balance of Harms*

The court is not required to reach the balancing analysis because the plaintiff has not made a showing of a likelihood of success on the merits or irreparable harm. To be thorough, however, the court will conduct the balancing analysis.

The plaintiff has argued that the defendant's burden is minimal because it can simply ask JusticePoint to perform a routine service call before and after the trip. On the other hand, the plaintiff says the harm to him lies in the concrete Fourth Amendment injury during an "unrepeatedable family vacation." He adds that the public has a strong interest in the lawful administration of government programs and in preventing unconstitutional searches and seizures and argues that the DOC already relies on self-reported travel dates.

The defendant says that the GPS device is required in the state. Even if a person moves out of state, the statute requires that GPS must be reinstated if he moves back. The defendant says that now, the Department's practice is to remove the device only when necessary—in other words, for certain medical procedures. The defendant has explained that the Department can confirm medical procedures with healthcare providers, but it is more difficult to track travel (particularly departures and returns). To the extent the plaintiff argues that the DOC used to remove the device for international travel, the defendant asserts that the change in policy was made after the DOC determined that the prior policy "created too great a risk to statutory compliance, public safety and

deterrence of sexual offenses." And she says that for any type of travel, keeping the device charged allows the defendant to know when the individual has returned.

The inconvenience, embarrassment and stigma suffered by the plaintiff do not outweigh the burden on the Department of removing the tracking device every time the plaintiff or any other monitored, unsupervised person wants to cross state lines. The plaintiff asks the court to find that the defendant's burden minimal because he is asking for only one removal and one reinstallation, for one person, for one trip. The court already has explained that that argument ignores the relief the plaintiff requests in the lawsuit—removal of the device for all class members for all temporary, out-of-state travel. The balance of harms weighs in favor of the defendant.

## III. Conclusion

The court **GRANTS** the plaintiff's request for an expedited briefing schedule. Dkt. No. 4.

The court **DENIES** the plaintiff's motion for preliminary injunction. Dkt. No. 4.

Dated in Milwaukee, Wisconsin this 12th day of November, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**